**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TAMAYAH JENKINS** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 23-2260** |
| | : | |
| **PETSMART, LLC** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                         **December 11, 2023**

   Tamayah Jenkins applied for work at a Philadelphia PetSmart retail store. She reviewed the PetSmart employment application over a web-based portal. PetSmart's online application process required Ms. Jenkins to review, and if she wanted the job, to agree to mandatory arbitration under a Dispute Resolution Policy for certain defined disputes arising from her employment including who decides if an issue is arbitrable. PetSmart's detailed Policy further confirmed Ms. Jenkins waived her right to bring a case on behalf of other employees and she agreed PetSmart could challenge the arbitration process if her lawyer brought fifty similar claims against PetSmart over a period of one hundred eighty days. Ms. Jenkins agreed to the Policy on the web-based portal. Ms. Jenkins later departed her employment. She then sued PetSmart in court.

   PetSmart moved to compel mandatory contractual arbitration and dismiss, or in the alternative strike class allegations and stay this case in court. We granted the parties leave for limited discovery to develop facts relating to Ms. Jenkins's unconscionability arguments. PetSmart now renews its motion. We apply the summary judgment standard to our post-discovery review. We find no evidence in the now-developed record allowing us to invalidate PetSmart's Dispute Resolution Policy under an unconscionability theory. There is no genuine dispute as to a material fact regarding the applicability of the arbitration provision. We enforce Ms. Jenkins's agreements. We decline to dismiss but will stay this case and compel arbitration consistent with the parties'

agreement. The parties agreed we decide the class action waiver. We strike the class action demand as waived. We set reporting obligations to ensure progress in the arbitration and, lacking progress, requiring parties show cause as to why we should not then dismiss without prejudice to later file a related case petitioning to enforce or vacate a final arbitration award.

## I.   Facts pleaded and adduced in discovery.

The City of Philadelphia began in April 2020, through its Fair Workweek Law, requiring covered employers to provide their employees in the service, retail, and hospitality sectors with, among other protections, a predictable work schedule, good faith estimates of work schedules, fourteen days advance notice of work schedules, and predictability pay for employer-initiated changes to employees' posted work schedules.[1] The City also allowed aggrieved employees to sue their employer for violating the Fair Workweek Law and incentivized private enforcement by allowing successful employees to recover their fees and costs in redressing the violations.

Tamayah Jenkins worked for PetSmart, LLC from June through November 2022 as an hourly employee at PetSmart's retail store in South Philadelphia.[2] PetSmart is a covered employer and Ms. Jenkins is a covered employee as defined by Philadelphia's Fair Workweek law.[3]

### A.  Ms. Jenkins agreed to PetSmart's Dispute Resolution Policy.[4]

Ms. Jenkins agreed to PetSmart's Dispute Resolution Policy at least five times when she applied to work at PetSmart in July 2020, June 2022, November 2022, and March 2023.[5] PetSmart required Ms. Jenkins, like all applicants seeking employment, to apply for work using a web-based program and sign various agreements relating to potential employment.[6] Applicants must create unique accounts to access the web-based program using a personalized username and password.[7] The first part of the online employment application, entitled "Pre-Application Consents and Disclosures," notifies applicants like Ms. Jenkins the employment application "contains a number

of disclosures and consent forms, including as to a Dispute Resolution Policy that provides for binding individual arbitration, which usually are provided in written form."[8] Ms. Jenkins acknowledged she had the right to receive disclosures and give consent or authorization on paper instead of electronically.[9] Ms. Jenkins agreed to receive consent forms electronically.[10]

Ms. Jenkins then needed to review the next page in the application entitled "Pre-Application Disclosures" directing Ms. Jenkins to the link to review the PetSmart Dispute Resolution Policy.[11] The application contains "PetSmart Dispute Resolution Policy Acknowledgments" under the link to the Policy stating the applicant and PetSmart agree to be bound by the Policy including its final and binding arbitration and class action waiver provisions.[12] Ms. Jenkins acknowledged she read and understood the Dispute Resolution Policy and agreed to be bound by it.[13] Applicants may take as long they desire to review the Policy—there is no time limit.[14] The Policy included her waiving an ability to have a "covered dispute" (as defined by the Policy) decided by a judge or jury trial, class action, class arbitration, collective action, collective arbitration, "Representative Action" or "Mass Arbitration (as defined by the Policy) and agreed a covered dispute must be resolved through mediation, an individual final and binding arbitration, or small claims court action, "except as otherwise expressly set forth in the [Policy], including in its Mass Arbitrations provisions."[15]

PetSmart through the "Pre-Application Disclosure" also provided Ms. Jenkins the ability to opt out of the Dispute Resolution Policy.[16] Ms. Jenkins acknowledged, understood, and agreed she "can elect to not be bound by the [Dispute Resolution Policy] or its Chosen State Law (as defined in the [Policy]) provisions" by following the procedures in the Dispute Resolution Policy entitled "**IS THERE A WAY TO OPT-OUT OF THE [DISPUTE RESOLUTION POLICY] OR ITS CHOSEN STATE LAW**?"[17] Ms. Jenkins, like all applicants, acknowledged, understood

and agreed the Policy is "***not*** a non-negotiable material term that I am required to accept in order to apply for, obtain or retain employment with [PetSmart], and that to the extent I desire to do so, I am free to seek to negotiate its terms as set forth" in the Dispute Resolution Policy.[18]

The opt-out procedure allows an applicant to opt-out of the Dispute Resolution Policy and Chosen State Law provision within thirty days of receiving a "notice or copy" of the Policy by sending a request to PetSmart's email arbitrationoptout@petsmart.com, by hand delivery, mail, or fax.[19] PetSmart's Associate Support Center Supervisor Eric Dewey swears PetSmart searched the email inbox and found no opt-out requests from Ms. Jenkins and has no record of a written communication from her asking to opt-out of the Dispute Resolution Policy or Chosen State Law by fax, mail, or hand delivery.[20] Ms. Jenkins did not opt out.[21] Ms. Jenkins did not read through all of the language in the application and does not remember agreeing to arbitration as part of the application process.[22]

### *The Policy requires PetSmart and employees to resolve "Covered Disputes" by arbitration.*

PetSmart, in the Dispute Resolution Policy, notifies applicants—in bolded block letters— "Unless you properly elect to not be bound by this [Dispute Resolution Policy], and except as set forth below, any Covered Disputes (as defined below) must be resolved only by voluntary mediation, mandatory final and binding individual arbitration, or in a small claims court action, which replace the right to otherwise go to court or an administrative agency, including the right to a judge or jury trial, to an administrative hearing, and to bring or participate in a representative action."[23]

PetSmart defines "Covered Disputes" as "any and all employment-related claims, causes of action, or other disputes that have already accrued, now exist, or arise in the future between a Covered Individual and [PetSmart] based on any legal equitable or other ground or theory … and

4

would constitute cognizable claims or causes of action in a federal, state, or local court or agency under applicable laws."[24] "Covered Disputes" include: "those arising out of or related to … a Covered Individual's actual or alleged employment with or work for Company, applying for or seeking or being denied such employment or work, the termination of such employment or work, and/or any of the terms, conditions, or benefits of such employment or work (including any wage and hour issues)."[25]

### *The Policy delegates arbitrability to the arbitrator.*

"Covered Disputes" also includes "issues of arbitrability (such as the formation, interpretation, applicability or enforceability of this [Dispute Resolution Policy]), … which must only be heard and decided by the appointed arbitrator."[26]

### *The Policy defines the Class Action Waiver and Mass Arbitrations provisions as "Excluded Disputes" to be decided by a court.*

PetSmart excludes Mass Arbitrations and class action waiver provisions from the arbitration obligations set in the Dispute Resolution Policy: "disputes regarding the applicability, interpretation, enforceability, and/or severability of the Mass Arbitrations … provisions and the Waiver Provisions of this [Dispute Resolution Policy], including whether such provisions are governed by the Federal Arbitration Act" and "any disputes as to whether a claim or dispute falls within this definition of Excluded Disputes" all of which "must be decided only by a court of competent jurisdiction."[27]

PetSmart defines a "Representative Action" as "any action or proceeding brought or sought to be brought by any person or entity (whether or not bound by this [Dispute Resolution Policy]) in a representative capacity on behalf of or for the benefit of (in whole or in part) a Covered Individual," including "any type of ... class action or arbitration."[28]

PetSmart defines "Mass Arbitrations" as "when [fifty] or more arbitration demands

asserting the same or similar Covered Disputes are made and/or sought to be compelled by Covered Individuals during any rolling 180-day period, and such Covered Individuals are represented by the same lawyer(s) or law firm(s) and/or by one or move of several affiliated or associated lawyers or law firms."[29]

### *The Policy provides arbitration costs are apportioned equally.*

The Covered Individual and PetSmart each pay their respective attorney's fees and costs.[30] PetSmart will pay up to all arbitration forum costs including arbitrator fees "[t]o the extent required by binding United States Supreme Court precedent."[31] Arbitration forum costs, including arbitrator fees, "shall be apportioned equally" between the Covered Individual and PetSmart "[u]nless binding United States Supreme Court precedent requires one party or the other to bear all or a greater share of the arbitration forum costs."[32] Fees and costs related to resolving whether arbitration demands constitute Mass Arbitrations shall be shared equally by the parties.[33]

### *The Policy defines the governing law under the Federal Arbitration Act and Delaware law.*

The Dispute Resolution Policy makes any arbitration proceedings "and any court or other proceedings concerning arbitration" under the Policy "expressly subject to and governed by the Federal Arbitration Act."[34] If state law is applicable under the Federal Arbitration Act or if a court decides the Dispute Resolution Policy and/or its Waiver Provisions are not subject to and governed by the Act, Delaware state law applies without regard to or application of conflict of laws principles.[35]

### B.  Ms. Jenkins sues PetSmart on behalf of a class of employees.

PetSmart terminated Ms. Jenkins's employment after she stopped appearing for work in November 2022.[36]  Ms. Jenkins then sued PetSmart on behalf of herself and a class of PetSmart's hourly employees at all Philadelphia retail store locations during any workweek within the class

period for violations of the Philadelphia Fair Workweek law.[37] Ms. Jenkins alleges PetSmart failed to provide her and other employees with a written good faith estimate of hours, dates, times, and locations of work, failed to provide fourteen days written notice of work schedules and without paying predictability pay, changed work schedules with less than fourteen days' written notice and without paying predictability pay, changed work schedules by more than twenty minutes requiring work past scheduled hours and without predictability pay, and failed to obtain written consent for additional hours worked in violation of Philadelphia's Fair Workweek Law.[38]

PetSmart moved to compel arbitration.[39] Ms. Jenkins opposed the Motion arguing the Dispute Resolution Policy is unconscionable.[40] We ordered limited discovery for the parties to develop facts relating to Ms. Jenkins's unconscionability argument.[41]

## II.  Analysis

PetSmart renews its motion to compel arbitration and dismiss the Complaint, or in the alternative strike class allegations and stay this litigation.[42] PetSmart argues Ms. Jenkins's challenges to the enforceability of the Policy must be resolved in arbitration because the parties agreed to delegate the issue of arbitrability to an arbitrator.[43] PetSmart argues our analysis ends there and we should send this matter to arbitration.[44] But it then argues if we decide we (rather than an arbitrator) should evaluate arbitrability, there is a valid agreement to arbitrate and Ms. Jenkins's claims fall within the scope of the agreement and we should compel arbitration.[45] PetSmart argues the Policy is not unconscionable because Ms. Jenkins had the opportunity to opt out but she did not.[46] PetSmart also asks us to enforce the class action waiver in the Dispute Resolution Policy and compel Ms. Jenkins to individual arbitration.[47]

Ms. Jenkins responds discovery confirms the Policy is not enforceable because it is procedurally and substantively unconscionable under Pennsylvania law.[48] Ms. Jenkins contends

we cannot sever the unconscionable terms making the entire Policy, and its arbitration scheme, unenforceable.[49] Ms. Jenkins argues the delegation clause is also unconscionable when paired with the costs provision in the Policy because it imposes "prohibitively high costs" on Ms. Jenkins merely to litigate the issue of arbitrability.[50] Ms. Jenkins argues we should stay the case and not strike the class allegations if we grant PetSmart's motion to compel arbitration.[51]

### A.  Who decides whether the issue is arbitrable?

We begin with "the mind-bending question" our Court of Appeals recognized as "the queen of all threshold issues in arbitration law": "Who decides—a court or an arbitrator—whether an agreement exists, when the putative agreement includes an arbitration provision empowering an arbitrator to decide whether an agreement exists?"[52] In other words, it is for us to "figure out whether the parties agreed to arbitrate the question of whether the parties agreed to arbitrate the dispute."[53]

Congress, through the Federal Arbitration Act, requires us to enforce arbitration agreements according to their terms.[54] Parties may delegate questions of arbitrability to an arbitrator if they "clearly and unmistakably" agreed to do so.[55] But "questions about the making of the agreement to arbitrate are for the courts to decide unless the parties have clearly and unmistakably referred those issues to arbitration in a written contract whose formation is not in issue."[56] A party agrees to arbitrate if (1) there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based dispute falls within the scope of the valid agreement.[57] But "these seemingly clear waters can become very murky when parties agree to delegate questions of arbitrability to arbitrators and a dispute thereafter arises about the legality or enforceability of the contract."[58]

These are the waters we tread today as the threshold issue: do we or an arbitrator decide

whether there is a valid agreement to arbitrate and whether Ms. Jenkins's claims fall within the scope of a valid agreement where Ms. Jenkins challenges the Dispute Resolution Policy and its delegation provision as unconscionable? We find we determine arbitrability based on Ms. Jenkins's unconscionability defense. We further find Ms. Jenkins's claims fall within the scope of the valid agreement.

### 1. We, not an arbitrator, determine arbitrability based on Ms. Jenkins's challenge to the delegation clause.

The parties agreed to section 3 of PetSmart's Dispute Resolution Policy referring "Covered Disputes" to arbitration, including "*issues of arbitrability* (such as the formation, interpretation, applicability *or enforceability* of this [Dispute Resolution Policy], … *which must only be heard and decided by the appointed arbitrator*."[59]

PetSmart argues we should compel Ms. Jenkins to arbitration because the Dispute Resolution Policy delegates arbitrability questions to the arbitrator in clear and unmistakable terms. Period. End of story. In PetSmart's view, we should end our analysis here and send Ms. Jenkins's Complaint to arbitration. Ms. Jenkins responds by challenging the clause delegating arbitrability to the arbitrator as unconscionable and arguing we should not enforce it.[60]

The Supreme Court in *Rent-A-Center, West, Inc. v. Jackson* held parties may contractually agree to submit issues of arbitrability to the arbitrator rather than a court.[61] Such provisions— called "delegation provisions"—confer on the arbitrator authority to decide "gateway" issues.[62] "Gateway" issues include whether the parties agreed to arbitrate or whether their agreement covers a particular controversy.[63] An agreement to arbitrate a "gateway" issues of arbitrability "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the [Federal Arbitration Act] operates on this additional arbitration agreement just as it does on any other."[64]

The question of who decides arbitrability "is itself a question of contract."[65] "Just as a court may not decide a merits question that the parties have delegated to an arbitrator, a court may not decide an arbitrability question that the parties have delegated to an arbitrator."[66] But before referring a dispute to an arbitrator, we must determine whether a valid arbitration agreement exists.[67] We may not decide the arbitrability issue if we find a valid agreement exists and if the agreement delegates the arbitrability issue to an arbitrator.[68]

Our Court of Appeals instructs when an agreement contains a delegation clause, we "cannot reach the question of the arbitration agreement's enforceability *unless* a party challenged the delegation clause and the court concludes that the delegation clause is not enforceable."[69] If a party does *not* challenge a delegation clause specifically, we "must treat it as valid and must enforce it by sending any challenge to the validity of the underlying *arbitration agreement* to the arbitrator."[70]

PetSmart argues we must compel Ms. Jenkins to arbitrate her claims, including arbitrability, because the Dispute Resolution Policy contains a clear and unmistakable delegation clause reserving to an arbitrator the threshold questions of arbitrability.[71] PetSmart cites *Rent-A-Center* and *Hampton v. PetSmart LLC*, a recent decision from the United States District Court for the Central District of California addressing PetSmart's Dispute Resolution Policy.[72]

We disagree with PetSmart and find both *Rent-A-Center* and *Hampton* are factually distinguishable. Unlike the employees in both *Rent-A-Center* and *Hampton*, Ms. Jenkins specifically challenges the delegation clause as unconscionable.[73] Under *Rent-A-Center*, we "must consider the challenge before ordering compliance" with the arbitration agreement where the employee challenges the delegation clause.[74]

In *Rent-A-Center*, the former employee did *not* challenge the delegation provision.[75] In

*Hampton,* the former employee sued PetSmart in state court alleging claims arising from her termination. PetSmart removed the action to federal court and moved to compel arbitration. Judge Blumenfeld concluded PetSmart's Dispute Resolution Policy expressly included a delegation clause referring issues of arbitrability to an arbitrator, the provision is not ambiguous, the parties did not dispute the Federal Arbitration Act applies to the case, and the Act allows parties to delegate threshold questions of arbitrability if they evince a clear and unmistakable intent to do so.[76] Judge Blumenfeld found PetSmart's Policy "clearly and unmistakably delegates threshold questions of arbitrability to the arbitrator" and because the employee's "unconscionability argument does ***not*** challenge the delegation provision but rather the agreement as a whole, the Court did not address this challenge as it had to be brought before the arbitrator."[77] Judge Blumenfeld's analysis appears consistent with the Supreme Court's *Rent-A-Center's* holding.

Ms. Jenkins raises a different challenge than the employees in *Rent-A-Center* and *Hampton*. She specifically challenges the delegation provision as unconscionable. Under *Rent-A-Center* and its progeny, we—not an arbitrator—must decide whether the parties entered into a valid delegation agreement and whether Ms. Jenkins's claims fall within its scope.[78] We apply the summary judgment standard to our analysis following discovery.[79]

### B.  PetSmart's delegation clause is not unconscionable.

Ms. Jenkins argues the Dispute Resolution Policy as a whole is procedurally unconscionable because it is presented in a "take-it-or-leave-it" manner, Ms. Jenkins felt economic pressure to agree, the Policy is difficult to read and designed to confuse lay people, and Ms. Jenkins lacked bargaining power.[80] PetSmart counters there is no procedural unconscionability because Ms. Jenkins had the option to opt out of the Policy.[81] PetSmart argues we must strike the class claims under the class action waiver, stay the case, and compel arbitration.

We must first consider whether to apply Pennsylvania law or Delaware law. Ms. Jenkins argues the Policy is unconscionable under Pennsylvania law notwithstanding a choice-of-law provision in the Policy applying Delaware law.[82]

When, as today, we base our subject matter jurisdiction on diversity, we look to the choice-of-law rules of Pennsylvania as the forum state to determine which state's substantive law applies to a contract provision even where the contract contains a choice-of-law clause.[83] Applying Pennsylvania law, our Court of Appeals long recognized Pennsylvania courts "generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them," adopting section 187 of the Restatement (Second) Conflict of Laws.[84] Section 187 provides contractual choice-of-law provisions will be enforced "***unless*** either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, ***or*** (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue."[85] Ms. Jenkins argues subsection (b) applies because application of Delaware law would be contrary to a fundamental policy of Pennsylvania which has a materially greater interest than Delaware in the determination of the "particular issue."[86]

PetSmart does not object to the application of Pennsylvania law. It contends the outcome is the same whether we apply Pennsylvania or Delaware law because under the law of both states.[87] We agree with PetSmart on this point. Under both Delaware and Pennsylvania law, a showing of unconscionability requires both procedural and substantive elements.[88] Ms. Jenkins must show procedural and substantive unconscionability under either state's law. We will apply Pennsylvania law today.

Judges applying Pennsylvania law often employ a "sliding scale" approach to determining

unconscionability, meaning "where the procedural unconscionability is very high, a lesser degree of substantive unconscionability may be required and presumably, vice-versa."[89] We begin by analyzing Ms. Jenkins's arguments as to the procedural unconscionability of the Dispute Resolution Policy. Although Ms. Jenkins makes these challenges to the entire Policy, and not specifically the delegation clause, we may consider them as part of her challenge to the delegation clause.[90]

A contract is procedurally unconscionable under Pennsylvania law where there is "a lack of meaningful choice in the acceptance of the challenged provision."[91] Contracts formed through "oppression and unfair surprise," "fraud or overwhelming economic power that would provide grounds for the revocation of any contract," and contracts of adhesion are generally considered procedurally unconscionable under Pennsylvania law.[92] A disparity in bargaining power does not render a contract unconscionable, and more is needed show an arbitration agreement "was not entered into willingly."[93] As our Court of Appeals explained, "[p]arties frequently possess varying degrees of bargaining power, and there is a 'range of ordinary and acceptable bargaining situations'" we are to distinguish from bargaining situations violating "strong public policy."[94] Factors we should consider in determining whether a contract is procedurally unconscionable include "the take-it-or-leave-it nature of the standardized form of the document," "the parties' relative bargaining positions," and "the degree of economic compulsion motivating the 'adhering' party."[95]

Ms. Jenkins argues the Policy is procedurally unconscionable.[96] Ms. Jenkins relies primarily on three authorities: our Court of Appeals' decision in *Alexander v. Anthony International, L.P.*[97]; a recent Pennsylvania Superior Court decision in *Kohlman v. Grane Healthcare Company*[98]; and an order entered in *Scally v. PetSmart, LLC*,[99] a putative class action

case brought by an employee against PetSmart in the United States District Court for the Northern District of California. We find these cases distinguishable and not helpful.

Our Court of Appeals twenty years ago in *Alexander* concluded an arbitration agreement in an employment contract is unenforceable because of unconscionability. The employer required two long-time heavy equipment and crane operators with limited educational backgrounds and "at best, very narrow options for other employment," to sign an employment contract with an arbitration agreement.[100] The acceptance of the employment contract containing an arbitration provision constituted a condition of employment and the employees did not have an opportunity to negotiate or reject its terms.[101] Our Court of Appeals found the employment contract procedurally unconscionable because of its "take-it-or-leave-it" nature leaving the two employees with "no real choice but to accept [its] terms."[102]

In *Kohlman*, an elderly nursing home resident with a number of medical conditions including blindness signed an arbitration agreement at the time of her admission to the nursing home while receiving narcotics and with no opportunity to read the arbitration agreement; without the presence of a family member; without a copy to review; and, the nursing home did not read or explain the terms of the arbitration agreement to her as a blind elderly resident.[103] The Pennsylvania Superior Court last year found "particularly significant" the fact the Director of the nursing home gave the resident incomplete oral information, the resident had no family member with her, and no one gave the resident a copy of the agreement for a family member to review especially when the blind elderly resident had no physical ability to read the arbitration agreement and other documents she signed.[104] The Pennsylvania Superior Court affirmed a finding of procedural unconscionability.[105]

We are also aware of a recent challenge to PetSmart's Policy. In *Scally*, a PetSmart

employee sued PetSmart individually and on behalf of a putative class for violations of California law.[106] PetSmart moved to compel arbitration. The employee challenged the cost-splitting provision in PetSmart's Dispute Resolution Policy as unconscionable.[107] Judge Gonzalez Rogers held the cost-splitting provision procedurally unconscionable, finding no evidence an applicant ever used the opt-out provision in the Dispute Resolution Policy, prospective applicants are unable to submit applications without agreeing to the arbitration agreement, and the "unique pressures" of pre-employment arbitration agreements together demonstrate "an oppressive power imbalance" creating "at least moderate procedural unconscionability."[108] Judge Gonzalez Rogers severed the cost-splitting provision from the Dispute Resolution Policy. But she then granted PetSmart's motion to compel arbitration.

The adduced discovery confirms Ms. Jenkins is not like the nursing home resident in *Alexander* or the employee in *Kohlman* and is more like the employee in *Quilloin*. In *Quilloin*, a college-educated nurse signed an employee acknowledgment form and fair treatment process brochure containing an arbitration provision.[109] The nurse later sued her employer and the health system moved to compel arbitration. The nurse challenged the arbitration provision as unconscionable. Judge Brody denied the motion to compel and the health system appealed.

Our Court of Appeals found Judge Brody erred in denying the health system's motion to compel arbitration.[110] Our Court of Appeals reasoned the nurse is not factually like, for example, employees with little educational background or employees whose immigration status is dependent on employment supporting a finding of procedural unconscionability.[111] The court explained the nurse did not lack a meaningful choice because she had a college degree and chose to agree to arbitration on more than one occasion.[112]

Ms. Jenkins is not like the nursing home resident in *Alexander* or the employee in *Kohlman*.

Ms. Jenkins completed high school and attended college for a period of time.[113] She does not assert a physical or mental condition impeding her ability to read, review, or understand PetSmart's employment application. She swears she did not read through "the legal language" and "do[es] not remember agreeing to arbitration as part of the application process."[114] But she had every opportunity to do so and chose not to. PetSmart's Policy includes an opt-out allowing Ms. Jenkins to "elect to not be bound by the [Dispute Resolution Policy] or its Chosen State Law provision" by following the opt-out procedures.[115] Ms. Jenkins acknowledged, understood, and agreed *five times* the Dispute Resolution Policy is "***not*** a non-negotiable material term that I am required to accept in order to apply for, obtain or retain employment with [PetSmart], and that to the extent I desire to do so, I am free to seek to negotiate its terms as set forth" in the Dispute Resolution Policy.[116] And while the Pre-Application Disclosures screen in the online application process required Ms. Jenkins to select either "I Agree" or "I do not agree and wish to end my application," the fact remains the Dispute Resolution Policy contains the opt-out provision she could have used to opt out of the Policy and PetSmart did not condition her employment on signing the Policy. We respectfully disagree with the finding of procedural unconscionability in *Scally* based on PetSmart's failure to proffer evidence the opt-out provision creates opportunities for "real negotiation" and "meaningful choice" for employees. The evidence relating to Ms. Jenkins leads us to a different finding.

We are aware several of our colleagues found opt-out provisions in employment arbitration agreements are not procedurally unconscionable, rejecting a lack of meaningful choice or "take-it-or-leave-it" argument of unconscionability. For example, Judge Marston concluded an arbitration agreement with an opt-out provision and a provision employment is not conditioned on signing the agreement precluded a finding of a lack of meaningful choice or "take-it-or-leave-it"

situation required for a showing of procedural unconscionability.[117] Judge Quiñones concluded an opt-out provision in an employment arbitration agreement is not a "take-it-or-leave-it" condition and the presence of the opt-out provision "seriously undermines" a claim of procedural unconscionability.[118] Judge Younge similarly found an arbitration provision containing an opt-out provision precluded a finding of procedural unconscionability.[119]

Ms. Jenkins cannot claim the Policy is procedurally unconscionable when she had a meaningful choice to opt out and chose to agree to it five times. We are guided by our Court of Appeals' decision in *Quillon*, where it found the arbitration agreement was not procedurally unconscionable because Ms. Quilloin chose to agree to it on more than one occasion.[120] Ms. Quilloin began working on a hospital, resigned to take another job, and then reapplied and the hospital rehired her.[121] Our Court of Appeals reasoned, "[e]ven if [Ms. Quilloin] was not initially informed of the agreement at either time she was hired, the fact remains that she quit her employment…to work for another employer, and then chose to go back and work once again… subject to the [same agreements]."[122] Our Court of Appeals reasoned even if Ms. Quilloin did not remember the arbitration agreement when she went back to work at the hospital, "we must presume that she was rehired knowing about the arbitration agreement which she had already signed, because parties are presumed to have knowledge of contracts they have signed."[123] Our Court of Appeals held Ms. Quilloin did not lack a meaningful choice in agreeing to arbitrate.[124]

The adduced discovery confirms Ms. Jenkins did not lack a meaningful choice to arbitrate. Ms. Jenkins acknowledged in her application she read the Policy and understood its terms and provisions each of the five times she agreed to it.[125] She did not opt out any of these times.[126] The fact she now claims she did not read the application is no excuse under well-settled law.[127] We are not persuaded by Ms. Jenkins's argument the Policy is procedurally unconscionable based on the

fact "virtually none" of the millions of PetSmart applicants exercised the opt-out option.[128] Discovery reveals some people *do* exercise the option, showing it is possible.[129] Ms. Jenkins, who admittedly did not read the agreement or try to opt out, cannot now claim it is impossible to do so or she was "forced" to agree to the Policy.[130]

Nor are we persuaded by Ms. Jenkins's argument the Policy is unconscionable because PetSmart does not provide applicants a copy of the Policy after agreeing to its terms.[131] Ms. Jenkins misreads the Policy. The Policy provides applicants may opt out within thirty days of receiving "notice *or* a copy of this DRP."[132] Online applicants receive "notice" of the Policy when they apply. The Policy does not suggest PetSmart will send applicants a copy of the Policy.

Ms. Jenkins contends there is no meaningful opportunity for negotiation because no applicants ever engaged in negotiations.[133] The fact no applicant has negotiated the Policy is not evidence applicants do not have the opportunity to do so. Ms. Jenkins, acknowledged, understood, and agreed the Policy is "***not*** a non-negotiable material term" she was required to accept to obtain employment and she could seek to negotiate its terms.[134] Ms. Jenkins does not argue she tried to negotiate, and PetSmart rejected her efforts.[135] Ms. Jenkins only argues she did not read the language of the agreement. Ms. Jenkins has not raised a genuine issue of material fact as to whether the agreement is negotiable.[136]

Ms. Jenkins argues the Policy is designed to confuse lay people by using complex legal language.[137] Ms. Jenkins relies on a decision of the United States District Court for the District of Arizona in support of her position.[138] In *Effio v. FedEx Ground Package*, Mr. Effio signed an agreement as a condition of his employment as a driver at FedEx.[139] Judge Silver found the arbitration provision procedurally unconscionable because it referenced a separate addendum at the end of the agreement which laid out key provisions including limitations on damages and

discovery.[140] This is simply not the situation Ms. Jenkins faced. PetSmart provided Ms. Jenkins with notice of the terms of its Policy up front by summarizing the key points of the Policy in its Pre-Application Disclosures.[141] It also used caps and bold text to highlight important points. Unlike the employer in *Effio*, PetSmart does not make it hard to find key provisions of its Policy.

Ms. Jenkins argues she lacked bargaining power relative to PetSmart, a large, nationwide retailer with billions of dollars in annual sales as compared to her status as a lower-wage worker needing work to support her financially stressed family.[142] We acknowledge the disparity in bargaining power which exists between employer and employee, but our Court of Appeals and Supreme Court instruct "a disparity of bargaining power, alone, is not sufficient to establish procedural unconscionability."[143]

We find no dispute of material fact Ms. Jenkins had a meaningful choice in agreeing to the Policy.[144] Ms. Jenkins cannot demonstrate her unconscionability defense after discovery. Her failure to show procedural unconscionability ends our inquiry.[145] We find because there is no threshold showing of any procedural unconscionability, unconscionability cannot be demonstrated even under a "sliding-scale" approach. There is a valid agreement between the parties to delegate questions of arbitrability to the arbitrator.

### C.  Ms. Jenkins's claims are within the scope of the arbitration agreement.

We now turn to whether Ms. Jenkins's claims fall within the scope of the arbitration agreement. PetSmart argues Ms. Jenkins's claims under Philadelphia's Fair Workweek Law fall within the scope of "Covered Disputes" subject to arbitration.[146] Ms. Jenkins does not address the scope issue, focusing her opposition entirely on the Policy's validity.

The Dispute Resolution Policy requires arbitration of "Covered Disputes" defined as: "any and all employment-related claims, causes of action, or other disputes that have already accrued,

now exist, or arise in the future between a Covered Individual and [PetSmart] based on any legal equitable or other ground or theory … and would constitute cognizable claims or causes of action in a federal, state, or local court or agency under applicable laws," including "those arising out of or related to … a Covered Individual's actual or alleged employment with or work for Company, applying for or seeking or being denied such employment or work, the termination of such employment or work, and/or any of the terms, conditions, or benefits of such employment or work (including any wage and hour issues)."[147]

Ms. Jenkins's claims PetSmart violated Philadelphia's Fair Workweek Law is a "Covered Dispute" relating to the "terms, conditions, or benefits of such employment or work (including wage and hour issues)." Ms. Jenkins does not dispute the scope of her claims falls within the arbitration provision.

### D.  We enforce the Mass Arbitrations and Class Action Waiver provisions.

PetSmart and Ms. Jenkins, through the Dispute Resolution Policy, agreed not every dispute goes to arbitration. They agreed to exclude "Mass Arbitrations" defined as: "when [fifty] or more arbitration demands asserting the same or similar Covered Disputes are made and/or sought to be compelled by Covered Individuals during any rolling 180-day period, and such Covered Individuals are represented by the same lawyer(s) or law firm(s) and/or by one or move of several affiliated or associated lawyers or law firms."[148]

Ms. Jenkins also agreed she would not bring a "Representative Action," including class actions and class arbitrations.[149] PetSmart defines a "Representative Action" as "any action or proceeding brought or sought to be brought by any person or entity (whether or not bound by this [Dispute Resolution Policy]) in a representative capacity on behalf of or for the benefit of (in whole or in part) a Covered Individual," including "any type of ... class action or arbitration."[150]

Both the Representative Actions and Mass Arbitrations waivers are "Excluded Disputes" *not* covered by the Dispute Resolution Policy and, consequently, not within the scope of arbitration.[151] We may determine the enforceability of these provisions.

### 1. The Mass Arbitrations waiver is not procedurally unconscionable.

Ms. Jenkins argues the Mass Arbitrations provision is "extremely" one-sided and is substantively unconscionable, she has standing to raise unconscionability, she already retained her attorneys presently implicated by the Mass Arbitrations waiver, and it is not waivable.[152] PetSmart argues the Mass Arbitrations waiver is not substantively unconscionable and points to Judge Gonzalez Rogers' decision in the *Scally* case finding the Mass Arbitrations waiver is not unconscionable (assuming, but not deciding, Ms. Scally's standing to challenge the provision).[153] And PetSmart argues we can sever the Mass Arbitrations waiver even if we found it unenforceable.[154]

We need not wade into these waters. We already determined the Policy (of which the Mass Arbitrations waiver is a term) is not procedurally unconscionable. The Policy, including the Mass Arbitrations waiver, is enforceable.

### 2. The Representative Actions waiver is not procedurally unconscionable.

PetSmart argues we should order Ms. Jenkins to arbitrate her claims individually because the Representative Actions waiver prohibits class actions and class arbitrations and class action waivers are routinely enforced.[155] PetSmart asks we strike the class allegations from the Complaint after compelling Ms. Jenkins to individual arbitration.[156]

Ms. Jenkins does not challenge the enforceability of the Representative Actions waiver specifically. But we assume her unconscionability argument applying to specific provisions also applies to the entire Dispute Resolution Policy, including the Representative Actions waiver. We

already determined the Dispute Resolution Policy is not procedurally unconscionable.

### E.  We stay pending arbitration but strike the class allegations.

Ms. Jenkins requests a stay pending arbitration if we send he parties to mandatory arbitration.[157] PetSmart concedes a stay pending arbitration is appropriate.[158] We stay the matter subject to reporting timely progress in the chosen forum while holding our progress in abeyance and consistent with Rule 1.[159]

Ms. Jenkins asks us to refrain from striking the class claims during the stay of this matter because doing so will restart the limitations period on the proposed class members' claims currently tolled under *American Pipe & Construction Co. v. Utah*.[160]

The Supreme Court in *American Pipe* held the timely filing of a class action tolls the applicable statute of limitations for all persons encompassed by the class complaint.[161] The Court clarified *American Pipe* tolling over the years; when class certification is denied, "members of the failed class [may] timely intervene as individual plaintiffs in the still-pending action, shorn of its class character" or "punitive class members … [may], after denial of class certification, prefer to bring an individual suit rather than intervene … once the economies of a class action [are] no longer available."[162]

But the teachings of *American Pipe* are not before us today. Ms. Jenkins cannot be a class representative; she waived her right to bring a class action or class arbitration. She could never be a class representative absent our invalidating the Dispute Resolution Policy. Ms. Jenkins does not show procedural unconscionability after affording her discovery. The Representative Actions waiver is enforceable. Ms. Jenkins waived her right to bring a class action.

We do not face the unfairness concerns addressed by the Supreme Court in *American Pipe* and its progeny. Ms. Jenkins agreed to not serve as a class representative. We are not suggesting

she lacks standing nor are we finding she is not typical under Federal Rule 23.[163] We only find she does not plead unconscionability necessary to invalidate her signature on the Dispute Resolution Policy including her agreement to not bring a class action.  Another employee may be able to plead or later offer a fact basis for unconscionability may be able to proceed. Ms. Jenkins has not done so. We decline to stay the decision on the enforceability of her class action waiver.

## III.    Conclusion

We grant PetSmart's Motion to compel, order Ms. Jenkins to individual arbitration, strike the class action demand, and stay the action subject to reporting progress consistent with Federal Rule 1.

---

[1] The City of Philadelphia's Fair Workweek law applies to covered employers defined as those with 250 or more employees worldwide and thirty or more locations worldwide, including chains and franchises. https://www.phila.gov/documents/fair-workweek-resources/ https://www.phila.gov/2020-03-19-understanding-predictability-pay-under-fair- workweek/

[2] ECF No. 1-1, Complaint ¶¶ 6, 8, 10–11. PetSmart LLC is a nationwide seller of pet food and supplies, and offers pet lodging, training, veterinary, grooming, and adoption services through retail stores and online. PetSmart employs over 56,000 people in 1,660 retail locations across the United States including five retail stores in Philadelphia.

[3] ECF No. 1-1, Complaint ¶¶ 9, 12; Phila. Code, Chapter 9-4600.

[4] The 2023 Dispute Resolution Policy is the operative agreement because it is the most recent arbitration agreement and it explicitly provides it "supersedes and replaces all prior policies or agreements providing for arbitration." ECF No. 26-4 at 30, Dispute Resolution Policy ¶ 23. *See Jaludi v. Citigroup*, 933 F.3d 246, 256 (3d Cir. 2019) ("Under Pennsylvania law, the later of two agreements between the same parties as to the same subject matter generally supersedes the prior agreement.").

[5] ECF No. 26-4, Declaration of E. Dewey at ¶¶ 11-12, 14-17; ECF No. 26-5 at 2-4, Stipulation, ¶¶ 1-9.  PetSmart hired Ms. Jenkins as a part-time associate and then later a cashier based on her June 2022 application. PetSmart did not hire her for any of the other positions she applied for.

[6] ECF No. 26-4, Declaration of E. Dewey ¶ 4.

[7] *Id.*, Declaration of E. Dewey ¶ 5.

---

[8] *Id.* at 37.

[9] *Id.*, Declaration of E. Dewey ¶¶ 11-12, 14-16; Exhibits 8-12.

[10] *Id.*

[11] *Id.* at 42.

[12] *Id.* at 42-43.

[13] *Id.*, Declaration of E. Dewey ¶¶ 11-12, 14-17; ECF No. 26-5 at 2-4, Stipulation, ¶¶ 4-9.

[14] ECF No. 26-4, Declaration of E. Dewey ¶ 9.

[15] *Id.* at 32, Dispute Resolution Policy.

[16] *Id.* at 42-43.

[17] *Id.* at 194. The "Chosen State Law" is Delaware law.

[18] *Id.* at 195 (emphasis added).

[19] *Id.* at 29, Dispute Resolution Policy ¶ 21.

[20] *Id.* at 8, Declaration of E. Dewey ¶¶ 17-18.

[21] *Id.* at 5–8, Declaration of E. Dewey ¶¶ 11-12, 14-17. The evidence shows an applicant can opt out. At least seven applicants opted out since PetSmart first implemented the electronic system. ECF No. 27 at 17; 28-1 at 7.

[22] ECF No. 27-4, Declaration of T. Jenkins ¶ 8.

[23] ECF No. 26-4 at 20, Dispute Resolution Policy, Introduction.

[24] *Id.* at 20-21, Dispute Resolution Policy ¶ 3. A "Covered Individual" is "any individual who has applied for employment with Company, who is actually or allegedly employed by Company, or whose actual or alleged employment with the Company terminates after becoming bound by this [Dispute Resolution Policy], and who wishes to initiate or participate in formal dispute resolution proceedings to resolve any Covered Disputes." *Id.* ¶ 2.

[25] *Id.* ¶ 3.

[26] *Id.*

[27] *Id.* ¶ 4.

[28] *Id.* ¶ 11.

[29] *Id.* ¶ 13.

[30] *Id.* ¶ 16.

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.* ¶ 20.

[35] *Id.*

[36] ECF No. 26-4, Declaration of E. Dewey ¶ 13. Ms. Jenkins applied for employment with PetSmart again in March 2023 for the position of Retail Store Manager but PetSmart did not hire her for the position.  ECF No. 27-13 at 6.

[37] ECF No. 1-1, Complaint ¶¶ 24–32. PetSmart removed Ms. Jenkins's complaint from the Philadelphia County Court of Common Pleas invoking our diversity jurisdiction under 28 U.S.C. § 1332 and the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).

[38] ECF No. 1-1, Complaint ¶¶ 14–23; Phila. Code § 9-4601 *et seq.*

[39] ECF No. 15.

[40] ECF No. 18.

[41] ECF No. 21.

[42] ECF No. 26.

[43] ECF No. 26-2 at 17-18.

[44] *Id.* at 18.

[45] *Id.* at 18-23.

[46] *Id.* at 23-26.

[47] *Id.* at 27.

[48] ECF No. 27 at 8-25.

[49] *Id.* at 25-27.

[50] *Id.* at 27-28.

[51] *Id.* at 28-29.

[52] *MZM Const. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 392 (3d Cir. 2020); *Zirpoli v. Midland Funding, LLC*, 48 F.4th 136, 140 (3d Cir. 2022).

[53] *Zirpoli*, 48 F. 4th at 142.

[54] *See* 9 U.S.C. §§ 2, 4.

[55] *MZM Const. Co., Inc.*, 974 F.3d at 401–02.

[56] *Id.* at 392 (quoting section 4 of the Federal Arbitration Act, 9 U.S.C. § 4) (internal quotations and citations omitted).

[57] *Zirpoli*, 48 F.4th at 142 (citations omitted).

[58] *Id.*

[59] ECF No. 26-4 at 20-21, Dispute Resolution Policy ¶ 3 (emphasis added).

[60] ECF No. 27 at 27-28.

[61] 561 U.S. 63, 68–69, 71 (2010).

[62] *Id.* at 68–69.

[63] *Id.*

[64] *Id.* at 70.

[65] *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. ----, 139 S. Ct. 524, 527 (2019); *Hernandez v. MicroBilt Corp.*, No. 22-3135, 2023 WL 8401682, at *3 (3d Cir. Dec. 5, 2023) ("Arbitration is a creature of contract, so the terms of MicroBilt's arbitration provision govern who, if anyone, was allowed to dismiss Hernandez's claims.").

[66] *Id.* at 530.

[67] *Id.* (citing 9 U.S.C. § 2).

[68] *Id.*

[69] *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 237 (3d Cir. 2020) (quoting *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226 (3d Cir. 2018)) (emphasis added).

[70] *MZM Const. Co.*, 974 F.3d at 399 (cleaned up) (quoting *Rent-A-Center*, 561 U.S. at 71) (emphasis in original).

[71] ECF No. 26-2 at 17-18.

[72] No. 22-1079, 2022 WL 2288308 (C.D. Cal. Mar. 18, 2022).

[73] ECF No. 27 at 27-28.

[74] *Rent-A-Center*, 561 U.S. at 70–71.

[75] *Id.* at 72 ("Nowhere in his opposition to Rent-A-Center's motion to compel arbitration did [the former employee] even mention the delegation provision.").

[76] *Hampton*, 2022 WL 2288308, at *2-3.

[77] *Id.* at *3 (citing *Rent-A-Center*, 561 U.S. at 72–74) (emphasis added).

[78] *Williams*, 965 F.3d at 237. In *Williams*, borrowers who received loans from a lender challenged the arbitration agreement, including the delegation clause, as unenforceable under the prospective waiver doctrine. *Id.* at 238. Our Court of Appeals ultimately concluded the entire arbitration agreement including the delegation clause is unenforceable and affirmed Judge Goldberg's order denying the motion to compel arbitration. *Id.* at 238–44. Although the basis of the court's decision rested on the prospective waiver doctrine—which is not an issue in this case—its reasoning is the same: an invalid provision renders an entire arbitration agreement unenforceable where the provision cannot be severed.

[79] We granted the parties' limited discovery concerning unconscionability after finding Ms. Jenkins presented "reliable evidence that is more than a naked assertion…[she] did not intend to be bound by the arbitration agreement." ECF No. 21 n. 1 (citing *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 774 (3d Cir. 2013)). Following discovery, "[m]otions to compel arbitration are reviewed under the Federal Rules of Civil Procedure summary judgment standard…permitting judgment where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 221, 228 (3d Cir. 2012) (citations omitted). We "may consider all affidavits, exhibits and discovery in the record." *Id.*

[80] ECF No. 27 at 9-18.

[81] ECF No. 28 at 7-8.

[82] ECF No. 27 at 7-8.

[83] *Collins on behalf of herself v. Mary Kay, Inc.*, 874 F.3d 176, 183 (3d Cir. 2017).

[84] *Gay v. CreditInform*, 511 F.3d 369, 389 (3d Cir. 2007) (quoting *Kruzits v. Okuma Machine Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994)); *see also Attain, LLC v. Workday, Inc.*, No. 17-3499, 2018 WL 2688299, at *4 (E.D. Pa. June 4, 2018) ("This Court sits in Pennsylvania, whose courts have adopted Section 187 of the Restatement (Second) Conflict of Laws, and accordingly generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them," in the absence of certain exceptional circumstances, none of which apply here.") (cleaned up); *Messer LLC v. Devault Packing Co., Inc.*, No. 18-4705, 2020 WL 5820747, at *2 (E.D. Pa. Sept. 29, 2020) ("In Pennsylvania, courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them.") (cleaned up).

[85] *Gay*, 511 F.3d at 389 (quoting Restatement (Second) Conflict of Laws § 187) (emphasis added). We recognize the section 187 speaks in "either-or" terms: Pennsylvania courts will enforce contractual choice-of-law provisions **unless either** (a) **or** (b). Ms. Jenkins argues subsection (b) only.

[86] ECF No. 27 at 7-8.

[87] ECF No. 26-2 at 18-19.

[88] *Dizon v. J.P. Morgan Chase*, No. 22-716, 2023 WL 2456063, at *3 (D. Del. Mar. 10, 2023) (applying Delaware law); *Rummel Klepper & Kahl, LLP v. Delaware River & Bay Auth.*, No. 20-0458, 2022 WL 29831, at *14 (Del. Ch. Jan. 3, 2022) (applying Delaware law); *Quilloin,* 673 F.3d at 230  (applying Pennsylvania law).

[89] *Quilloin*, 673 F.3d at 230 (citing *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 125 & n. 12 (2007)) (cleaned up).

[90] *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226-27 (3d Cir. 2018) ("In specifically challenging a delegation clause, a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions.").

[91] *Quilloin*, 673 F.3d at 235 (quoting *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 119 (Pa. 2007)).

[92] *Id.* (citations omitted).

[93] *Id.* (citation omitted).

[94] *Id.* (quoting *Salley*, 925 A.2d at 120, n. 3).

[95] *Id.* at 235-36 (quoting *Salley*, 925 A.2d at 125).

[96] ECF No. 27 at 9-18.

[97] 341 F.3d 256 (3d Cir. 2003).

[98] 279 A.3d 42 (Pa. Super. Ct. 2022).

[99] No. 22-6210 (N.D. Cal.).

[100] *Alexander*, 341 F.3d at 266.

[101] *Id.* at 259.

[102] *Id.* at 266.

[103] *Kohlman*, 279 A.3d at 48-49.

[104] *Id.* 48-50.

[105] *Id.* at 51–52.

[106] *Scally*, No. 22-6210 (N.D. Cal.).

[107] *Scally*, No. 22-6210, ECF No. 34 (N.D. Cal. May 25, 2023).

[108] *Id.* at 5.

[109] *Quilloin*, 673 F.3d at 225.

[110] *Id.* at 237.

[111] *Id.* at 235–37.

[112] *Id.*

[113] ECF No. 27-4, Declaration of T. Jenkins ¶ 5.

[114] *Id.* ¶ 8.

[115] ECF Doc. No. 26-4 at 29-30, Dispute Resolution Policy ¶ 21.

[116] ECF No. 26-4 at 235.

[117] *Matthew v. Gucci*, No. 21-434, 2022 WL 462406, at * 10 (E.D. Pa. Feb. 15, 2022).

[118] *Stephenson v. AT&T Servs., Inc.*, No. 21-709, 2021 WL 3603322, at * 7, n. 10 (E.D. Pa. Aug. 13, 2021) (collecting cases).

[119] *Nelson v. Gobrands, Inc.*, No. 20-5424, 2021 WL 4262325, at * 8 (E.D. Pa. Sept. 20, 2021).

[120] 673 F.3d 221, 237 (3d Cir. 2012).

[121] *Quilloin*, 673 F.3d at 225.

[122] *Id.* at 237.

[123] *Id.* at 237.

[124] *Id.*

[125] ECF No. 26-4, Stipulation, ¶¶1-9; Dewey Decl. ¶¶ 11-12, 14-17 & Exs. 8-12.

[126] ECF No. 26-4, Dewey Decl. ¶¶ 11-12, 14-17.

[127] *Morales v. Sun Constructors, Inc.*, 541 F.3d 218, 221 (3d Cir. 2008) ("'It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained.'") (quoting *Upton v. Tribilcock*, 91 U.S. 45, 50 (1875)); *Broomall Operating Co. LP v. Eldridge*, No. 20-2168, 2021 WL 3910723, at *7 (E.D. Pa. Aug. 31, 2021) ("[T]he failure to read a contract is not a defense to its enforcement.") (collecting cases).

[128] ECF No. 27 at 17.

[129] See ECF No. 26-4 at 243-322.

[130] Ms. Jenkins contends she felt economic pressure to agree to the Policy, which she argues contains various misrepresentations. ECF No. 27 at 10-11, 14-15. She also argues applicants are forced to agree to the Policy to even submit an application for a job at PetSmart and this is unconscionable. ECF No. 27 at 9. We find it unnecessary to address the substance of Ms. Jenkins's claims as to "misrepresentations" in the Policy because her arguments are undermined by the fact she had a meaningful opportunity to exercise her opt-out option and negotiate the terms of the Policy.

[131] ECF No. 27 at 9-10, 15-16.

[132] ECF No. 26-4 at 29, Dispute Resolution Policy ¶ 21 (emphasis added).

[133] ECF No. 27 at 11. Ms. Jenkins also argues in a footnote the Policy is not negotiable because it instructs employees to contact PetSmart's General Counsel if they wish to negotiate the terms but it provides a link to a URL which does not include the identity of any "General Counsel." ECF No. 27 at 11 n. 13. We need not credit this argument as the Policy provides other ways employees can negotiate, including through email or mail correspondence. See ECF No. 26-4 at 30, Dispute Resolution Policy ¶ 24.

[134] ECF No. 26-4 at 235 (emphasis added).

[135] *Davis v. Cintas Corp.*, No. 18-1200, 2019 WL 2223486, at *14 (W.D. Pa. May 23, 2019) ("Mr. Davis claims (in his brief) that he did not have an opportunity to negotiate the terms of the Agreement, but does not allege that he sought to negotiate them, was told that he could not negotiate them, or had raised objections to them in any way."); *Progressive Pipeline Mgmt., LLC v. N. Abbonizio Contractors, Inc.*, No. 10-4551, 2011 WL 1343031, at *5 (E.D. Pa. Apr. 7, 2011) (finding no procedural unconscionability, reasoning "Plaintiff does not offer any evidence, other than Conrad's affidavit, to support its argument that the subcontract was non-negotiable. Plaintiff does not produce a single fax, email, or letter demonstrating that Abbonizio refused to cooperate or was unwilling to entertain proposed changes to the agreement.").

[136] *See Beery v. Quest Diagnostics, Inc.*, 953 F. Supp. 2d 531, 545-46 (D.N.J. 2013) ("Plaintiffs have presented no evidence that they were not free to negotiate the terms of the Employment Agreement containing the Arbitration Clause; indeed, they have presented no evidence that they even tried to do so. Plaintiffs' unsupported belief that the Company would have insisted, or did insist, on these terms is insufficient to require a finding that Arbitration Clause is procedurally unconscionable.").

[137] ECF No. 27 at 12-14.

[138] *Id.* at 14 n. 17. Ms. Jenkins relies on Microsoft Office's Flesch Reading Ease Scale to show the Policy is difficult to read. ECF No. 27 at 12-13. Ms. Jenkins contends Pennsylvania law requires automobile insurance policies have a readability score of 40 or more on the Flesch scale. There is no such requirement for analyzing arbitration provisions. We must make an independent determination of unconscionability.

[139] No. 08-1522, 2009 WL 775408, at *4 (D. Ariz. Mar. 20, 2009).

[140] *Id.* at *1, *4.

[141] ECF No. 26-4, Dewey Decl. ¶ 8 and Ex. 6.

[142] *Id.* at 11-12.

[143] *Davis v. Cintas Corp.*, No. 18-01200, 2019 WL 2223486, at *14 (W.D. Pa. May 23, 2019) (citing *Quillon*, 673 F.3d at 235 (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 32-22 (1991)). Ms. Jenkins cites three cases in support of her position she lacks bargaining power: a district court decision and two decisions of our Court of Appeals. We find each of these cases distinguishable based on the fact they involved "take-it-or-leave-it" agreements and did not offer the opportunity for negotiation. *Doe 1 v. Darden Restaurants, Inc.*, No. 20-0862, 2022 WL 265949, at *8 (M.D. Pa. Jan. 27, 2022) ("The DRP is presented to employees on a take-it-or-leave-it basis as a condition of their employment."); *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 201 (3d Cir. 2010) (procedural unconscionability where employee dependent on employer with respect to his immigration status at the time he accepted the job offer was provided with agreement on take-it-or-leave-it basis); *Lucey v. FedEx Ground Package Sys., Inc.*, 305 F. App'x 875, 878 (3d Cir.

2009) (procedural unconscionability where FedEx did not give drivers an opportunity to read, review, or negotiate the terms of the agreement).

[144] Because we so find, we need not address the parties' arguments regarding the substantive conscionability of the cost provision when "paired with" the delegation clause or the severability of the cost provision from the Dispute Resolution Policy.

[145] *See Clerk v. ACE Cash Exp., Inc.*, No. 09-05117, 2010 WL 364450, at *10 (E.D. Pa. Jan. 29, 2010) ("Because Plaintiff has failed to meet her burden of proving procedural unconscionability, the Court need not delve into an inquiry regarding substantive unconscionability."); *Zimmer v. CooperNeff Advisors, Inc.*, 523 F.3d 224, 230 (3d Cir. 2008) ("Because we have concluded that the arbitration agreement here was not procedurally unconscionable and reverse on that basis, we need not decide whether the District Court's decision as to substantive unconscionability was correct.").

[146] ECF No. 26-2 at 22-23.

[147] ECF No. 26-4 at 21, Dispute Resolution Policy ¶ 4.

[148] *Id.* ¶ 13.

[149] *Id.* ¶ 11.

[150] *Id.*

[151] *Id.* ¶ 4.

[152] ECF No. 27 at 22-25.

[153] ECF No. 26-2 at 24-25.

[154] *Id.*  at 25.

[155] *Id.* at 27.

[156] *Id.*

[157] ECF No. 27 at 28-29.

[158] ECF No. 26.

[159] 9 U.S.C. § 3; *Lloyd v. Hovensa, LLC*, 369 F.3d 263, 269 (3d Cir. 2004).

[160] 414 U.S. 538 (1974).

[161] *China Agritech, Inc.v. Resh*, 584 U.S. ---, 138 S.Ct. 1800, 1804 (2018).

[162] *Id.* at 1804 (citations omitted).

[163] *See Duncan v. Governor of Virgin Islands*, 48 F. 4th 195 (3d Cir. 2022).